NO. COA14-335

NORTH CAROLINA COURT OF APPEALS

Filed: 2 December 2014

MAYFORD WYATT,
    Plaintiff,

    v.                                    From North Carolina Industrial
                                          Commission
                                          I.C. No. W06970
HALDEX HYDRAULICS, Employer,
and SENTRY INSURANCE, Carrier,
    Defendants.


    Appeal by Defendants from opinion and award entered 10

January 2014 by the North Carolina Industrial Commission. Heard

in the Court of Appeals 10 September 2014.


        *Pressly, Thomas & Conley, PA, by Edwin A. Pressly, for
        Plaintiff.*

        *Hill Evans Jordan & Beatty, PLLC, by Richard T. Granowsky,
        for Defendants.*


        STEPHENS, Judge.


    Employer Haldex Hydraulics and its insurer Sentry Insurance

(collectively, "Defendants") appeal from an opinion and award of

the full North Carolina Industrial Commission ("the Commission")

filed 10 January 2014. The Commission's opinion and award

affirmed an opinion and award by Deputy Commissioner Keischa M.

Lovelace, filed 13 May 2013, which had determined that Plaintiff

Mayford Wyatt sustained compensable injuries to his brain and spine as a result of a workplace lifting accident on 31 October 2008. We affirm.

*Background*

The evidence before the Commission tended to show that Plaintiff began working at Defendant's Statesville plant in 1988, where he was employed as a CNC Setup Operator and was cross-trained on the operation of several different machines used by Defendant to produce hydraulic gear pumps and transmissions for companies such as John Deere and Caterpiller.

On 31 October 2008, Plaintiff and a co-worker were conducting inventory, counting aluminum parts stored in metal tubs on metal shelves. To remove the tubs, Plaintiff first slid them off the shelves, which were coated with an oil film from the gear manufacturing process, then his co-worker grabbed the front handle while Plaintiff twisted his body to the left and reached into the shelf with his right arm to grab the other handle. The two men then placed the tubs on the floor, counted and labeled and replaced the parts, and returned the tubs to the shelves. Plaintiff was injured when he attempted to remove a mislabeled tub that contained parts made of a material much heavier than aluminum: instead of an expected weight of 60 to 70

pounds, the tub weighed approximately 280 pounds. As his co-worker grabbed the front handle, Plaintiff balanced on one knee holding the back handle, then twisted and turned with the tub and fell to the floor with it. Plaintiff was taken to the Iredell Memorial Hospital emergency room twice that day due to pain in his lower back. As a result of his injuries, Plaintiff was out of work from 31 October 2008 through 11 December 2008. Defendants accepted the compensability of Plaintiff's low back condition pursuant to a Form 60.

On 9 December 2008, Plaintiff's primary care physician, Dr. Daniel Bellingham, assessed Plaintiff with right L3-4 nerve root impingement and referred him to a spine surgeon for consultation. Shortly thereafter, Plaintiff was permitted to return to work with light duty restrictions of no lifting over 25 pounds, limited bending and twisting, and no stooping or squatting. Plaintiff received ongoing treatment at OrthoCarolina, and eventually orthopedic surgeon Dr. Theodore Belanger diagnosed Plaintiff's low back condition as lumbar stenosis with persistent back and right leg pain, numbness, and weakness, which did not require surgical intervention. In December 2009, Plaintiff submitted a Form 25R *Evaluation for Permanent Impairment*. On 25 January 2010, the Industrial

Commission approved a Form 26A, *Employer's Admission of Employee's Right to Permanent Partial Disability Compensation*, awarding Plaintiff $12,932.32 for a permanent partial impairment rating of 7.5% as a result of his low back injury.

Throughout the treatment of his low back condition in 2009 and 2010, Plaintiff also complained of seemingly unrelated symptoms that began almost immediately after his 31 October 2008 accident, including dizziness, loss of balance, nausea, stuffy ears, sinus pressure, fatigue, insomnia, severe headaches, and episodic numbness in his face, tongue, torso, and limbs. During the two months he was unable to work in late 2008, Plaintiff's family noticed that he remained in bed and slept most of the time, experienced difficulty walking and balancing, could not keep his car on the road as he was unable to apply steady pressure to the gas pedal, frequently dozed off mid-sentence during conversations, and had difficulty understanding, prompting his relatives to explain things to him in an "elementary way." Previously an active church member who regularly attended services on Wednesday and twice on Sunday, Plaintiff did not attend church for almost two months. When he returned in December 2008, church members noticed an observable decline in his health. Plaintiff had trouble maintaining his

balance, dragged his foot when walking, had difficulty hearing, and fell into a deep sleep during services and conversations. Upon his return to work, Plaintiff's co-workers observed a noticeable decline in his physical abilities: Plaintiff regularly slept at his work station, walked slowly, and appeared to drag one of his legs while walking. Other machine operators had to be assigned to perform Plaintiff's lifting tasks, and his team leader noticed he had trouble understanding directions and suffered from balance issues.

Plaintiff's doctors offered multiple diagnoses, including sinusitis and sleep apnea, but his symptoms persisted, and in March 2010 he was referred for a neurological consult after an MRI of his brain showed a herniated cerebellar tonsil consistent with a Chiari malformation. A Chiari malformation is a condition at the junction of the neck and skull that causes compression of the part of the central nervous system where the spine joins the brain. There are two types of Chiari malformation: congenital Chiari malformations occur from a person's congenital cranium formation, whereas acquired Chiari malformations can develop through intracranial hypotension, which is a cerebrospinal fluid ("CSF") balance issue between the brain and the spine that can be caused by lifting injuries resulting in cerebrospinal fluid

leaks. Chiari malformations can result in a condition known as "brain sag." Typically, the brain is supported within the skull and spinal column by cerebral spinal fluid, but when spinal fluid is at a lower pressure underneath the brain, the brain tends to sag down towards the base of the skull. Classic symptoms of a Chiari malformation include severe headache associated with coughing, problems with balance, dizziness, difficulty walking, and cranial nerve dysfunction which can cause facial symptoms, tongue numbness, and balance and swallowing difficulties. However, symptoms indicative of Chiari malformations are also suggestive of other medical conditions unrelated to the brain, cervical spine compression, and other neurological abnormalities, and it is not uncommon for a person to exhibit symptoms of a Chiari malformation over an extended period of time before diagnosis.

On 18 March 2010, Plaintiff sought treatment with Dr. John Wilson, a board-certified expert in neurological surgery. While certain aspects of Dr. Wilson's examination were indicative of Chiari malformation, other aspects suggested a problem further down Plaintiff's cervical spine. A subsequent cervical MRI showed significant stenosis with cord signal changes, so Dr. Wilson performed an anterior cervical discectomy, decompression,

and fusion on 16 April 2010. At his follow-up appointment on 20 May 2010, Plaintiff reported complete resolution of his symptoms, which surprised Dr. Wilson, who had anticipated needing to perform a Chiari decompression to alleviate Plaintiff's symptoms. However, on 26 August 2010, Plaintiff returned to Dr. Wilson with complaints of dizziness, difficulty balancing, facial numbness, bowel control issues, and "things not tasting good." On 12 October 2010, Plaintiff complained of the same symptoms, as well as hearing problems, decreased sensation on his right side, and double vision. On 1 November 2010, Dr. Wilson performed two surgical procedures on Plaintiff: a Chiari decompression and a C3 laminectomy with C2-C5 fusion. At a follow-up appointment on 16 December 2010, Plaintiff reported some improvement in his dizziness but complained of persistent balance difficulties, as well as hand-to-eye coordination issues, hearing "echoes," and falling asleep while driving.

On 4 February 2011, Plaintiff was taken to the Iredell Memorial Hospital emergency room suffering from quadriparesis and then immediately transferred to Wake Forest Baptist Hospital for assessment of a neurological emergency. Dr. Thomas Sweasey, a board-certified expert in neurosurgery and neurocritical care,

was the neurosurgeon on call and determined after reviewing an MRI that Plaintiff needed surgery to treat cervical spondylosis, severe canal stenosis, and significant spinal cord impingement with evidence of cord signal change. Dr. Sweasey performed a posterior cervical decompression and fusion. Although Plaintiff recovered from his quadriparesis, his MRIs indicated he suffered from "brain sag," and Dr. Sweasey subsequently assumed responsibility for Plaintiff's care as his treating physician. Between 15 March 2011 and 27 October 2011, Plaintiff was hospitalized four times complaining of extreme somnolence, frontal headaches, trouble balancing and walking, dizziness, hearing loss, slurred speech, memory and comprehension issues, and bladder control problems. At Dr. Sweasey's direction, Plaintiff underwent an array of different diagnostic tests and assessments——including lumbar punctures, a ventricular peritoneal shunt, and two cranioplasty procedures on the back part of his skull——to determine the cause of his "brain sag" and the best options for treatment. Dr. Sweasey consulted with several specialists, including Dr. Thomas Ellis, co-director of the Deep Brain Stimulation Program at Wake Forest, who noted that, although Plaintiff's "presentation is somewhat difficult to truly classify as one diagnosis," his symptoms were "most

convincing for communicating hydrocephalus as he has significant brain sag." However, after extensive interviews with Plaintiff and his family regarding his medical history and the onset and progression of his symptoms, Dr. Sweasey eventually diagnosed Plaintiff with cervical cord compression and an acquired Chiari malformation caused by intracranial hypotension.

Plaintiff continued to work for Haldex Hydraulics between 11 December 2008 and 15 April 2010. On 11 February 2010, Plaintiff suffered a fall while working. He received treatment at an urgent care office for his back and hip, but did not miss any work due to the fall. On 13 April 2010, Plaintiff gave written notice to Defendant that he wished to enter a severance agreement to begin following his short-term disability leave, which ran from 23 April 2010 through the week ending 29 May 2010. On 4 June 2010, Plaintiff signed a severance agreement, release, and waiver, indicating that his employment with Defendant terminated 28 May 2010.

*Procedural History*

On or about 1 July 2010, Plaintiff filed a Form 18 *Notice of Accident to Employer and Claim of Employee, Representative, or Dependent* with the Commission, alleging injuries to his back, neck, and leg sustained from his 31 October 2008 accident.

Plaintiff subsequently filed a Notice of Change of Condition on 28 June 2011. On 14 February 2012, Plaintiff's wife filed a Form *42 Application for Appointment of Guardian Ad Litem*, which the Commission ultimately approved, because of Plaintiff's difficulties with his hearing, reasoning, and memory. She also averred that she felt it was unsafe to leave Plaintiff alone. On 5 March 2012, Plaintiff filed a Form 33 *Request for Hearing* and on 26 March 2012, Plaintiff filed an Amended Form 33 stating that his injuries were to his back, neck, and brain. Defendants responded and denied compensability for Plaintiff's cervical and cognitive problems. Deputy Commissioner Lovelace heard the matter on 10 August 2012 and issued an opinion and award concluding that Plaintiff's intracranial hypotension, Chiari malformation, and cervical spine conditions were causally connected to his 31 October 2008 work-related injury; that Plaintiff was disabled from working; and that he was entitled to indemnity and medical compensation. Defendants timely appealed the opinion and award to the full Commission on 16 May 2013.

The Full Commission heard the matter on 25 October 2013 and issued an opinion and award on 10 January 2014 affirming Deputy Commissioner Lovelace's opinion and award with minor modifications, over a dissent without written opinion from

Chairman Andrew T. Heath. During the course of its hearing into the causation and compensability of Plaintiff's brain and cervical spine injuries, the Commission reviewed depositions taken from Dr. Bellingham, Dr. Belanger, Dr. Wilson, and Dr. Sweasey.

Dr. Bellingham, Plaintiff's primary care physician, did not render an opinion regarding the causal relationship between Plaintiff's cervical and brain conditions and the 31 October 2008 workplace lifting accident, but testified that he did not expect Plaintiff's condition to improve, stating "we can always hold out hope, but he hasn't made a lot of change for quite some time."

Dr. Belanger, an orthopedic surgeon who treated only Plaintiff's low back condition, agreed with the Chiari malformation diagnosis but opined within a reasonable degree of medical certainty that it was a congenital, rather than acquired, condition and that he therefore did "not see how a single lifting injury of any sort could cause or contribute in any material way to []Chiari malformation, which is a congenital anomaly present since birth." Dr. Belanger also opined to a reasonable degree of medical certainty that Plaintiff's cervical spine condition was due to degenerative cervical spondylosis and

therefore not caused by any particular event or injury, including the 31 October 2008 accident, although he did acknowledge it was possible that an acute event could exacerbate or aggravate Plaintiff's underlying condition. However, the Commission assigned little weight to Dr. Belanger's expert opinion, given that Dr. Belanger did not treat Plaintiff for either his cervical spine or his brain condition, and further admitted that only 10 to 15 of the 2,000 to 3,000 patients he treats annually need treatment for symptomatic Chiari malformations, and he typically refers those patients to neurosurgeons.

Dr. Wilson confined his expert opinion to the conditions for which he treated Plaintiff between March and December 2010. He testified that while certain aspects of his examination indicated a Chiari malformation, Plaintiff was not experiencing brain sag at the time of his treatment, and therefore Dr. Wilson would not give a causative opinion regarding Plaintiff's brain sag, although he did note that it may have subsequently developed as a consequence of the Chiari decompression procedure he performed. Further, Dr. Wilson testified that it was plausible for a lifting injury to cause brain sag, although that was not something he considered in his evaluation of Plaintiff.

While Dr. Wilson would not give an opinion regarding an acquired Chiari malformation caused by intracranial hypotension, he explained that it could occur

> if a person during the course of some kind of injury or heavy lifting . . . developed a spontaneous CSF leak somewhere in their spinal column, and so the CSF is leaking and they develop spontaneous intracranial hypotension, the brain sags, the cerebellar tonsils descend, [and] that is hypothetically a possible way you can develop this kind of tonsillar descent.

Regarding Plaintiff's cervical spine condition, Dr. Wilson opined that although a Chiari malformation can cause cervical cord compression, Plaintiff's condition was not causally related to his 31 October 2008 workplace lifting accident, but was instead the result of degenerative cervical spondylosis, which Plaintiff's lifting injury did not exacerbate.

Dr. Sweasey diagnosed Plaintiff with acquired Chiari malformation and opined to a reasonable degree of medical certainty that the most likely cause was intracranial hypotension, of which the most likely proximate cause was a spinal fluid leak secondary to Plaintiff's 31 October workplace lifting injury. Dr. Sweasey's opinion was based upon the significant amount of time he spent conducting tests and discussing Plaintiff's case with other specialists, as well as

Plaintiff and his family. Dr. Sweasey further opined that Plaintiff's temporary improvement following the procedures Dr. Wilson performed in April and November 2010 was indicative of intracranial hypotension, explaining that more likely than not, every time Plaintiff's spine is manipulated during a surgical procedure, pressure is left on the thecal sac because there is some blood left behind, and Plaintiff's condition improves dramatically as the blood helps support the brain. The improvement, however, is temporary as Plaintiff's condition worsens as the blood is absorbed by the surrounding tissue. Dr. Sweasey also testified that the cause of Plaintiff's Chiari malformation was unknown during Dr. Wilson's treatment because, he explained, Plaintiff was in a very small group of people "where the mechanism they acquire, the [C]hiari malformation is decreased pressure which allows the brain to sag and the cerebellum to sag through the foramen magnum, which then causes them to be symptomatic." Regarding Plaintiff's cervical cord compression, Dr. Sweasey opined that more likely than not Plaintiff's condition resulted from an aggravation of an underlying cervical condition sustained during his 31 October 2008 workplace injury. As Dr. Sweasey explained, consistent with Plaintiff's gradual onset of symptoms, a person may have spinal

cord compression and irritation without initially experiencing pain but then slowly develop a deficit over time. Dr. Sweasey further opined that, more likely than not, Plaintiff's cervical spine issue is related to leakage of spinal fluid from a nerve root with the fluid absorbed by the surrounding tissue. Finally, Dr. Sweasey opined that, more likely than not, Plaintiff will not be able to maintain gainful employment on a permanent basis as a result of his injuries.

Ultimately, the Commission assigned the most weight to Dr. Sweasey's expert opinion. As the Commission explained in its conclusions of law:

> The greater weight of the medical evidence showed that symptomatic [C]hiari malformations, whether congenital or acquired, are rare conditions that are treated by neurosurgeons. Both neurosurgeons who treated Plaintiff diagnosed Plaintiff with a [C]hiari malformation. As stated in the findings of fact, the Full Commission assigned greater weight to the expert opinion of Dr. Sweasey than Dr. Wilson[,] as Dr. Wilson limited his expert opinion to his treatment time period and did not consider the effect of the extensive medical treatment, testing, and specialist consultations that occurred subsequent to Dr. Wilson's treatment of Plaintiff. In contrast, Dr. Sweasey consulted numerous specialists, conducted a variety of diagnostic tests, interviewed Plaintiff and his family extensively[,] and reviewed Plaintiff's voluminous medical records to determine Plaintiff's diagnosis, treatment

> modalities, and the cause of Plaintiff's condition. Dr. Sweasey's expert opinion is legally sufficient to establish a causal connection between Plaintiff's intracranial hypotension and cervical spine condition to his work-related injury.

Thus, based on a preponderance of the evidence of record, the Commission found as facts that, as a result of his 31 October 2008 workplace lifting injury, "Plaintiff sustained an intracranial hypotension that caused an acquired [C]hiari malformation, or brain sag" and also that "Plaintiff sustained an exacerbation or aggravation of his underlying and pre-existing cervical spondylosis resulting in cervical stenosis, cervical cord compression, and other causally related conditions."

The Commission also concluded that Plaintiff's claim was timely filed and that Plaintiff had met his burden of proof to show he was incapable of earning pre-injury wages in either the same or any other employment and that the incapacity to earn pre-injury wages was caused by Plaintiff's injury, given Dr. Sweasey's testimony that more likely than not, Plaintiff will not be able to return to gainful employment in the future due to his acquired Chiari malformation caused by intracranial hypotension. Therefore, the Commission concluded that "Plaintiff is entitled to have Defendants pay for all related medical

expenses incurred or to be incurred that are necessary and reasonable treatment that would effect a cure, give relief or lessen Plaintiff's period of disability" and further ordered that Defendants pay Plaintiff $663.35 per week in temporary total disability compensation, dating back to 1 November 2010 and continuing until Plaintiff can return to work. Defendants gave timely notice of their intent to appeal the Commission's opinion and award pursuant to N.C. Gen. Stat. § 97-86.

*Standard of Review*

This Court's review of an opinion and award by the Commission is limited to two inquiries: (1) whether there is any competent evidence in the record to support the Commission's findings of fact; and (2) whether the Commission's conclusions of law are justified by the findings of fact. *See Deese v. Champion Int'l Corp.*, 352 N.C. 109, 116, 530 S.E.2d 549, 553 (2000). The Commission's conclusions of law are reviewable *de novo. See Whitfield v. Lab. Corp. of Am.*, 158 N.C. App. 341, 348, 581 S.E.2d 778, 783 (2003) (citation omitted). As for the Commission's findings of fact, if supported by competent evidence, they are conclusive even if the evidence might also support contrary findings. *Jones v. Candler Mobile Village*, 118 N.C. App. 719, 721, 457 S.E.2d 315, 317 (1995) (citation

omitted). Indeed, the Commission is "the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Adams v. AVX Corp.*, 349 N.C. 676, 680, 509 S.E.2d 411, 413 (1998) (citation omitted). On appeal, this Court "does not have the right to weigh the evidence and decide the issue on the basis of its weight" because our duty "goes no further than to determine whether the record contains any evidence tending to support the finding." *Anderson v. Lincoln Constr. Co.*, 265 N.C. 431, 434, 144 S.E.2d 272, 274 (1965) (citation omitted).

*Causation of Plaintiff's Brain Condition*

Defendants first argue that the Commission erred in concluding Dr. Sweasey's expert medical testimony was legally sufficient to establish a causal connection between Plaintiff's brain condition and his work-related lifting accident on 31 October 2008. Specifically, Defendants contend that Dr. Sweasey's opinion does not constitute competent evidence to support the Commission's causation determination because Dr. Sweasey could not definitively confirm the existence of the cerebrospinal fluid leak that he testified caused Plaintiff's intracranial hypotension which in turn resulted in Plaintiff's brain sag. Thus, Defendants claim Dr. Sweasey's opinion was based merely upon speculation and conjecture, which, based on

our Supreme Court's decision in *Young v. Hickory Bus. Furniture*, 353 N.C. 227, 538 S.E.2d 912 (2000), Defendants insist is "not sufficiently reliable to qualify as competent evidence on issues of medical causation." *Id.* at 230, 538 S.E.2d at 915. Therefore, Defendants argue that the Commission erred in concluding Plaintiff's brain condition was caused by his work accident and compensable under the Workers' Compensation Act. We disagree.

In *Young*, our Supreme Court reversed this Court's opinion affirming an award of the Commission due to a complete lack of competent evidence to support the Commission's findings of fact——that the plaintiff's fibromyalgia was caused by a work-related accident——because the medical causation testimony the Commission relied upon was based entirely on one expert's speculation and conjecture. *Id.* at 231, 538 S.E.2d at 915. A careful review of that expert's testimony revealed that he considered fibromyalgia to be "an illness or condition of unknown etiology" and that he "frequently could not ascribe a cause for fibromyalgia in his patients." *Id.* Moreover, the expert admitted there were at least three alternative potential causes for the plaintiff's condition but that he had performed no tests to rule them out, although he did acknowledge that additional tests "need[ed] to have been done." *Id.* Instead, his diagnosis relied entirely upon the *post*

*hoc ergo propter hoc* fallacy, given his testimony that, "I think that she does have fibromyalgia and I relate it to the accident primarily because, as I noted, it was not there before and she developed it afterwards. And that's the only piece of information that relates the two." *Id.* at 232, 538 S.E.2d at 916. The Court ultimately concluded that because the expert's testimony "demonstrate[ed] his inability to express an opinion to any degree of medical certainty" as to causation and was based "solely on supposition and conjecture," it was incompetent and insufficient to support the Commission's findings of fact. *Id.* at 233, 538 S.E.2d at 917.

In the present case, Defendants contend Dr. Sweasey's testimony reveals that his medical causation opinion is founded solely on speculation and conjecture, and is thus analogous to the expert opinion rejected as incompetent in *Young*. Specifically, Defendants point to Dr. Sweasey's testimony that "we don't have any documentation of [a cerebrospinal fluid leak]" when he was asked how he reached his opinion that Plaintiff's condition was caused by intracranial hypotension resulting from the workplace accident. Additionally, Defendants emphasize that Dr. Sweasey acknowledged there are multiple mechanisms by which a person can acquire intracranial

hypotension, but was unable to state the percentage of cases in which the event causing the condition was ultimately identified, and did not testify to any diagnostic testing or other actions that he took to rule out other potential causes.

However, the full context of Dr. Sweasey's testimony demonstrates that locating a cerebrospinal fluid leak was just one of "three different pathways" by which Dr. Sweasey could have arrived at his intracranial hypotension diagnosis. Dr. Sweasey went on to explain that his diagnosis was more informed by the nature and sequence of Plaintiff's symptoms and Plaintiff's responses to various tests, treatments, and surgical procedures. Notably, Dr. Sweasey testified that the fact Plaintiff's symptoms improve when he is placed in a supine position "suggests that there is a pressure differential inside of his head that allows the sag to occur when he's upright," and that Plaintiff's dramatic temporary improvement immediately following an epidural blood patch——which Dr. Sweasey testified is a "common treatment for spinal fluid leaks"——and two cranioplasties further confirmed that Plaintiff suffered from intracranial hypotension, "the most likely proximate cause of [which] was a spinal fluid leak secondary to his injury."

Defendants also contend that Dr. Sweasey's opinion is based merely upon speculation because his testimony established that there is no scientific basis for working backwards in time to connect Plaintiff's brain sag to his 31 October 2008 injury. Specifically, Defendants highlight Dr. Sweasey's testimony, when asked how to pinpoint precisely how long it takes for brain sag to develop after intracranial hypotension, that

> I don't think we have enough cases in our literature to say, you know, how long that is going to take. I'm sure it could be very immediate in some individuals. I'm sure it could take days in some. I'm sure it could take longer in others. But I don't have any way of proving that at this point in time.

Defendants' argument fails to persuade us. Rather than proving his causation opinion "is of no more value than a layman's opinion," as Defendants insist based on *Young*, a careful review of the transcript of Dr. Sweasey's testimony makes clear that his point was that because the medical literature is still evolving and different patients experience the onset of their symptoms at different times, that makes close observation of each individual patient's history and reactions to treatment all the more crucial. And here, unlike the expert in *Young*, Dr. Sweasey spent months consulting with numerous specialists, conducting a variety of diagnostic tests and extensive

interviews with Plaintiff and his family, and reviewing Plaintiff's voluminous medical records to determine his diagnosis, treatment modalities, and the cause of Plaintiff's condition, which is why the Commission ultimately found his causation opinion most persuasive.

Defendants further attempt to undermine Dr. Sweasey's causation opinion by contrasting it with Dr. Wilson's testimony. As Defendants emphasize, Dr. Wilson testified that the onset of brain sag and Chiari malformation are not typically associated with traumatic injuries, but can develop in response to Chiari decompression surgeries like the one he performed on Plaintiff on 1 November 2010. Indeed, Defendants argue that there is no competent evidence indicating Plaintiff suffered from intracranial hypotension-induced brain sag prior to Dr. Wilson performing the Chiari decompression. However, this argument ignores several of the Commission's findings of fact which, because Defendants do not challenge them, are presumed conclusive. First, testimony from Plaintiff's family, co-workers, and fellow church members describes Plaintiff suffering from symptoms of Chiari malformation and brain sag beginning in the weeks and months immediately following his 31 October 2008 accident. Plaintiff saw multiple physicians for treatment of

these symptoms, but it took over a year before he was referred to a neurologist, which is in keeping with the Commission's finding that symptoms indicative of Chiari malformations are also suggestive of other medical conditions unrelated to the brain, cervical spine compression, and other neurological abnormalities, and it is not uncommon for a person to exhibit symptoms of a Chiari malformation over an extended period of time before a correct diagnosis is reached. Finally, Defendants ignore Dr. Wilson's own testimony that it is indeed hypothetically plausible for a lifting injury to cause brain sag. While Dr. Wilson would not give an opinion regarding an acquired Chiari malformation caused by intracranial hypotension because it was not something he considered in evaluating Plaintiff's condition, he explained that it could occur

> if a person during the course of some kind of injury or heavy lifting . . . developed a spontaneous CSF leak somewhere in their spinal column, and so the CSF is leaking and they develop spontaneous intracranial hypotension, the brain sags, the cerebellar tonsils descend, [and] that is hypothetically a possible way you can develop this kind of tonsillar descent.

In light of Dr. Sweasey's testimony and the rest of the evidence of record, we conclude Defendant's objections regarding Dr. Sweasey's inability to pinpoint the exact source of

Plaintiff's intracranial hypotension go more to the weight of his opinion than its competence. Indeed, despite their claim that Dr. Sweasey's causation opinion is mere speculation, the majority of Defendants' argument reads more like an invitation for this Court to reweigh the evidence that was presented before the Commission. We recognize that Defendants presented substantial evidence that *would* have supported a contrary determination regarding the cause of Plaintiff's brain condition. But as our prior cases make clear, it is not this Court's place or prerogative to second-guess the Commission's credibility determinations so long as its findings of fact are supported by competent evidence. *See Adams*, 349 N.C. at 680, 509 S.E.2d at 413. Because we do not agree with Defendants' contention that Dr. Sweasey's opinion was so speculative as to render it incompetent, we hold the Commission did not err in concluding that his causation opinion was legally sufficient to support its determination that Plaintiff's injury was, in fact, compensable under our State's Workers' Compensation Act.

*Aggravation of Plaintiff's Cervical Spine Condition*

Defendants next argue that the Commission erred in concluding that Dr. Sweasey's causation opinion was legally sufficient to establish that Plaintiff's 31 October 2008 lifting

injury caused an exacerbation or aggravation of his underlying and pre-existing cervical spine condition. We disagree.

As indicated in the Commission's findings of fact:

> Dr. Sweasey opined that more likely than not, Plaintiff's cervical cord compression for which he underwent surgery on April 16, 2010 and November 1, 2010 resulted from an October 31, 2008 aggravation of an underlying cervical condition. Dr. Sweasey explained that symptom onset was subtle and did not become apparent until over time. A person may have spinal cord compression and spinal cord irritation for which a person does not feel pain, but slowly over time the person develops a deficit. Dr. Sweasey also stated that more likely than not, Plaintiff's cervical spine issue is related to leakage of spinal fluid from a nerve root with the fluid absorbed by the surrounding tissue.

Here again, Defendants challenge the Commission's findings based on their prior argument that Dr. Sweasey's causation opinion was too speculative to be considered competent under *Young* and demonstrates his reliance on the *post hoc, ergo propter hoc* fallacy. To support their claim, Defendants highlight Dr. Sweasey's testimony that,

> basically looking backwards, and trying to find what I considered the common thread through the whole picture, you know, original spinal surgery, Chiari decompression, subsequent spine surgery, subsequent shunt, subsequent cranioplasty of two different forms, epidural blood patches, the common thread when I look back through

all of that appears to be intracranial hypotension secondary to the lifting injury, and more likely than not the problem that we discussed as far as a leakage of spinal fluid from a nerve root.

The spine issue in the cervical spine . . . appears to have a relationship to that, too. So that's why I label that as likely—more likely than not being related to the lifting injury, also. Again, it's my opinion. Finding an actual absolute perfect thread for that one is harder, but I think certainly, you know, I would base my opinions and everything more on the intracranial hypotension issue. And I think that fits better with his picture all the way through.

Defendants repeat their allegations that Dr. Sweasey's testimony is incompetent because it failed to pinpoint the location of Plaintiff's cerebrospinal fluid leak and there is no scientific basis for working backwards from Plaintiff's cervical spine condition to his 31 October 2008 injury. However, as already discussed, these objections go more to the weight of Dr. Sweasey's opinion than its competence.

Defendants also emphasize that neither Dr. Belanger nor Dr. Wilson agreed with Dr. Sweasey's diagnosis. While this appears to be another invitation for this Court to reweigh the evidence that was before the Commission, which we decline to do, we also note that both Dr. Belanger and Dr. Wilson testified that it was plausible that a lifting injury could aggravate a previously

asymptomatic degenerative cervical spine condition. Moreover, as the Commission indicated, Dr. Wilson agreed that cervical cord compression can be related to Chiari malformation and that, in this circumstance, causation questions are best viewed retrospectively because of the subtle onset of cervical cord compression symptoms, which can overlap with Chiari malformation symptoms and similarly do not become apparent until over time.

Accordingly, we hold that the Commission did not err in concluding that Dr. Sweasey's causation opinion was legally sufficient to establish that Plaintiff's 31 October 2008 lifting injury caused an exacerbation or aggravation of his underlying and pre-existing cervical spine condition.

*Timely Notice to Satisfy Statute of Limitations*

Defendants next argue that the Commission erred in concluding that Plaintiff timely filed a claim for workers' compensation benefits for his Chiari malformation caused by intracranial hypotension based on the Form 18 that Plaintiff filed on or about 1 July 2010 seeking benefits for injuries to his neck, back, and leg. Specifically, Defendants contend that because Plaintiff's Form 18 did not explicitly reference the injury to his brain, he should be barred from recovery for his

brain sag by our Workers' Compensation Act's statute of limitations. We disagree

As Defendants point out, N.C. Gen. Stat. § 97-24 establishes a two-year statute of limitations for claims for compensation arising from work-related injuries, and although Plaintiff's accident occurred on 31 October 2008, Plaintiff did not file any claims for compensation that specifically referenced his resulting brain injury until he filed a Form 33 on 5 March 2012. Nevertheless, as our Supreme Court has made clear, our State's Workers' Compensation Act "requires liberal construction to accomplish the legislative purpose of providing compensation for injured employees, and that this overarching purpose is not to be defeated by the overly rigorous technical, narrow and strict interpretation of its provisions." *Gore v. Myrtle/Mueller*, 362 N.C. 27, 36, 653 S.E.2d 400, 406 (2007) (citation and internal quotation marks omitted).

In the present case, Plaintiff suffers from a rare brain condition that is notoriously difficult to properly diagnose given its symptoms, and we believe it would defeat the purpose of the Act to deny him benefits because he was unable to fully diagnose his condition himself within the two-year statute of

limitations period. Moreover, because Defendants do not challenge the Commission's finding of fact that

> [C]hiari malformation, tonsillar descent, and brain sag affect the region of the body where the cervical spine joins the brain causing neurological abnormalities throughout the central nervous system; therefore, the Full Commission finds that the Form 18 filed on or about July 1, 2010 referencing Plaintiff's back and neck sufficiently stated a claim for his medical condition related to [C]hiari malformation and that his claim is not time barred[,]

we consider it conclusive on appeal. Thus, we agree with the Commission's conclusion of law that the reference in Plaintiff's Form 18 to his neck, back, and leg sufficiently identified the body parts affected by his work-related injury. Therefore, because Plaintiff filed his Form 18 prior to the expiration of the two-year statute of limitations, we hold the Commission did not err in concluding Plaintiff's claim was not time barred.

*Temporary Total Disability Benefits and Medical Compensation*

Finally, Defendants argue that the Commission erred in its conclusions of law that Plaintiff is entitled to temporary total disability benefits and medical compensation based on Dr. Sweasey's causation opinion. However, in light of the analysis above, we hold that the Commission did not err in concluding that Plaintiff's brain and cervical spine injuries were

compensable and that Plaintiff met his burden of proof by satisfying the first prong of the *Russell* test through "the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment." *Russell v. Lowes Product Distribution*, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (citation omitted). Accordingly, the opinion and award of the Commission is

AFFIRMED.

Judges CALABRIA and ELMORE concur.